WINTERSHEIMER, Justice,
dissenting.
I respectfully dissent from the majority opinion because the legislative intent to prohibit the buying and selling of children is abundantly clear in regard to KRS 199.-590(2). I fully agree with the dissent written by Justice Vance.
In my view, the people of the Commonwealth of Kentucky have not abdicated their sovereignty to a self-appointed group of scientists-kings. The tolerance of the many can easily lead to the tyranny of a few. The attractiveness of assistance to childless couples should not be a cosmetic facade for unnecessary tampering with human procreation.
Animals are reproduced; human beings are procreated.
The procedure endorsed by the majority is nothing more than a commercial transac *215 tion in which a surrogate mother receives money in exchange for terminating her natural and biological rights in the child. This permits the infant to be adopted by the infertile wife and apparent biological father.
The apparent biological father is obviously not adopting his own child but actually purchasing the right to have the child adopted by his own infertile wife. Regardless of the good intentions that may give rise to such a practice, the commercialization of this type of personal problem is exactly what KRS 199.590(2) is intended to prevent.
The Kentucky legislature has not been silent on the public policy question of surrogate parenting. When the General Assembly was given the opportunity to authorize surrogate parenting in Kentucky, that body refused to adopt language which would legalize such a procedure. During the 1984 General Assembly, House Bill 421 was adopted so as to permit certain forms of genetic engineering. A similar Senate amendment to the original statute would have provided for surrogate parenting. The legislature rejected surrogate parenting. It is totally proper to interpret this recent legislative activity and history as a clear indication that surrogate parenting violates the current statute and its policy against the unauthorized purchase and sale of children for adoption by this type of processing. Frequently we have heard complaints of an absence of legislative history. In this situation, we have the opportunity to review the legislative record and the majority chooses to ignore it.
It is curious to note that the majority states that “There is no doubt but that KRS 199.590 is intended to keep baby brokers from overwhelming an expectant mother or the parents of a child with financial inducements to part with that child.” However, the majority apparently loses its judicial insight into the proper interpretation of the activities of the General Assembly when it comes to surrogate parenting.
Surrogate parenting obviously contemplates adoption by the infertile wife of the apparent biological father. The infertile wife is prominently included in all definitions of surrogate parenting which we have examined.
The corporate charter of this entity acknowledges her in its statement of purpose which is to assist infertile couples in obtaining a biologically related child. Once the obvious certainty of the infertile wife’s presence is recognized, it cannot be logically denied that the certainty of adoption must logically follow. The termination of parental rights by the surrogate mother is a necessary predicate to a subsequent adoption by the infertile wife. The apparent biological father and/or husband is only an intermediary who acquires and assists the transfer of the parental rights of the two females involved.
The contracts employed in this case go to great length to avoid mentioning adoption or including any specific reference to the infertile wife. As noted by the Court of Appeals, this does not prevent a reviewing court from recognizing the true nature of the commercial transaction involved. The purpose of the language of the contract is merely to avoid KRS 199.590(2). It is an obvious subterfuge.
Adoption made possible through paid termination of a surrogate’s parental rights, is an essential part of the surrogating procedure. Accordingly it is in direct contradiction to the policy and the expressed language of KRS 199.590(2), which prohibits the purchase and sale of children.
I am not at all unmindful of the precious gift of life demonstrated by the birth of a child to infertile couples. Certainly this is a most attractive prospect. However, it still remains that the end does not justify the means.
The fact that a woman’s infertility can be cured is a matter that evokes serious questions of medical and public policy. The prospect of host-mothers with wombs for hire is immediately possible. There are already sperm banks and egg banks could be next. It is entirely possible, as we have seen in this case, that reproduction can be arranged by contract' and financial payment. In my view the consequences which could arise from the opening of the human *216 uterus to commercial medical technology does not contribute to the emancipation of women. In my opinion, the safeguarding of marriage and the family is essential to the continuation of human society as we know it. The possibility of exploitation of women as surrogate mothers is totally undesirable.
There is no question that our age is one • of expanding biomedical technology. In every era people believe they are at a “turning point” on the threshold of new development. There are some moments in history when such an impression is justified. The law must be stable, yet it cannot stand still. Our legal system is workable only because it has been continually restructured to meet society’s changing needs. The Brave New World of Aldous Huxley seems to be upon us. The intrusion of government into the private lives of individuals forecast in George Orwell’s 1984, seems to be here.
I certainly agree that the legal system should not avoid the necessary legal problems that arise from the advances of sciences.
I agree with the majority that decisions relating to the outlawing of surrogate parenting are better left with the legislature. In my view the legislature has already indicated their displeasure with the type of commercial transaction involved in this case.
Our consideration of public policy in this regard should include the possible exploitation of financially-needy women. Although there may be some altruistic women who will volunteer as surrogate mothers, the greater prospect is that monetary payment will have to be made to surrogates. The offer of financial payment will undoubtedly persuade financially needy women to sell their reproductive faculties for the benefit of those who can pay. The price at which a woman will sell her reproductive capacity may depend on her financial status.
Another public policy factor relating to surrogate mothering is the long-standing interest in society for the preservation of the traditional family. The family unit has been under severe attack from almost every element of our modern commercial society, yet it continues as the bedrock of the world as we know it. Any practice which threatens the stability of the family unit is a direct threat to society’s stability. The question is whether the introduction of a third contracting party, the surrogate mother, substantially deviates from and threatens the traditional family concept. I believe that the legislature has already expressed their opinion that surrogate mothering tends to violate public policy. See Surrogate Mothering; Medical Reality in a Legal Vacuum, Journal of Legislation, Vol. 8, No. 1, Winter (1981), for an extensive discussion of the entire subject.
Certainly important practical results from the growing ability to scientifically control biological reproduction demands legislative attention.
The decision to become pregnant parallels the fundamental right of reproductive privacy. The adopting couple’s claimed right of reproductive privacy does not appear to be sufficiently similar. The emphasis in reproductive privacy is on the right of the individual to control his or her reproductive faculties. To give a second party the right to control another person’s reproductive capacity would appear to be contradictory. Although a surrogate mother’s decision to become pregnant is a fundamental right, another party would not have the right to contract for the control of her pregnancy. The principle case that addresses surrogate mothering is Doe v. Attorney General, 106 Mich.App. 169, 307 N.W.2d 438 (1981), lv.den., 414 Mich. 875 (1982), cert. den. 459 U.S. 1183, 103 S.Ct. 834, 74 L.Ed.2d 1027 (1983).
The majority opinion is based on an incorrect interpretation of the statute which does not correctly reflect the true legislative intent, and it does not properly express the general public policy as enunciated by the legislature.
I would affirm the decision of the Court of Appeals.